UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WACHOVIA SECURITIES, LLC, n/k/a WELLS FARGO ADVISORS, LLC, and GEORGE GORDON, III,<br><br>          Plaintiffs,<br><br>    vs.<br><br>GREGORY RAIFMAN, in his individual capacity, SUSAN RAIFMAN, in her individual capacity, GEKKO HOLDINGS, LLC, and HELICON INVESTMENTS, LTD.,<br><br>          Defendants. | Case No:  C 10-04573 SBA<br><br>**ORDER GRANTING PLAINTIFFS' EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Dkt. 3 |

      The parties are presently before the Court on Plaintiffs' Ex Parte Motion for Temporary Restraining Order and Order to Set Show Cause Hearing for a Preliminary Injunction.  Dkt. 3. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS the motion for the reasons set forth below.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  <u>See</u> Fed.R.Civ.P. 78(b).

I.    **BACKGROUND**

    A.    **FACTUAL BACKGROUND**

      On July 19, 2010, Defendants Gregory Raifman and Susan Raifman filed a Statement of Claim with FINRA, to commence arbitration against the instant Plaintiffs - Wachovia Securities Financial Network, LLC ("Wachovia") and George Gordon, III ("Gordon"), a Wachovia financial advisor (collectively, "Plaintiffs").  Compl. ¶ 1.  In their Statement of Claim, the Raifmans assert the following claims against Plaintiffs: (1) fraud, concealment, and

conspiracy to commit fraud; (2) breach of fiduciary duty; (3) breach of contract; (4) aiding and abetting fraud and breach of fiduciary duty; (5) violation of the California Securities Act; (6) violation of NASD and NYSE rules; and (7) conversion. Id. ¶ 13; see also Dkt. 4, Wood Decl., Ex. A at 20-26. Defendants seek, among other things, $2,128,035 in compensatory damages and $10,235,600 in consequential damages. Wood Decl., Ex. A at 27. On July 27, 2010, FINRA sent a letter to Plaintiffs, stating that they were required to answer the Statement of Claim before September 15, 2010 (that deadline has since been extended to October 22, 2010 by stipulation). Wood Decl., Ex. B. [1]

The Raifmans bring their FINRA action individually and as trustees of the Raifman Family Revocable Invervivos Trust (the "Raifman Trust"), as sole members of Gekko Holdings, Ltd. ("Gekko"), and as assignees in interest and beneficial owners of Helicon Investments, Ltd. ("Helicon"). Id., Ex. A at 2. As explained more fully below, the Statement of Claim alleges that each of these three entities had entered into separate "90% Stock Loan" transactions with third-party Derivium Capital, LLC ("Derivium") or its related entities.

### 1.    The First Loan Transaction Between the Raifman Trust and Derivium

According to the Statement of Claim, Derivium marketed a "90% Stock Loan" to prospective borrowers, including the Raifmans. Id. at 6. Derivium solicited the Raifmans to pledge publicly-traded stock (specifically, shares in "ValueClick") to Derivium as collateral for loans in the amount of 90% of the collateral's market value. Id. The 90% Stock Loan was marketed as a way for owners of securities to borrow up to 90% of the value of their stock without selling the stock. Id. at 2. A major feature in the marketing material for the 90% Stock Loan was that the transaction was a loan, not a sale, so even though the Raifmans would receive 90% of the value of their securities in cash as a loan, the loan would not trigger capital gains tax recognition, and the Raifmans could defer paying capital gains tax for the three-year loan term. Id. Derivium represented to the Raifmans that it would employ a proprietary

---

[1] That letter also states that the Statement of Claim was filed on May 21, 2010, but that appears to be in error, as the Statement of Claim is dated July 19, 2010.

hedging strategy that would preserve the value of the collateral.  Id. at 6.  At the end of the loan term, the Raifmans could pay the loan balance and retrieve their collateral, surrender their collateral in satisfaction of the loan, or renew their loan.  Id.

In August 2003, based upon these representations, and upon the advice of the Raifmans' own financial advisors, Private Consulting Group, Inc. ("PCG") and Joe Ramos, PCG's Managing Director, the Raifmans entered into a loan agreement, as trustees of the Raifman Trust, with Derivium.[2]  Id. at 12.  Derivium and PCG instructed the Raifmans to open an account at Wachovia in the name of the Raifman Trust.  Id.  Wachovia selected Gordon as the financial advisor to the Raifmans' account.  Id. at 13.

When the Raifmans' opened their Wachovia account, they completed an Account Application, listing under the section "Account Registration" the "Raifman Family Rev Inter Trust DTD 07/02/2003 Gregory R. Raifman & Susan Raifman TTEES."  Dkt. 15, Raifman Decl., Ex. 1 at 1.  That section also includes the name "Gregory R. Raifman" and a mailing address.  Id.  The application also states that the account is a "Non-Personal Account Types – Trust," and the Raifmans indicate in their respective signatory lines that they are each signing under the title "TTEE."  Id. at 3.  Moreover, under the section "Primary Account Owner Information," the application lists only the "Raifman Fam Rev Inter Trust."  Id.

In his declaration, Mr. Raifman represents that the Account Application "registered the Raifman Family Rev. Inter. Trust, Gregory Raifman, and Susan Raifman as trustee and Gregory R. Raifman as the Account holders."  Id. ¶ 2 (emphasis added).  However, according to the Gordon Declaration, "the Raifmans, in their individual capacities, never opened an account with me at Wachovia ...."  Dkt. 6, Gordon Decl. ¶ 4 (emphasis added).  Moreover, Plaintiffs have submitted a declaration from Christina Minakais, senior paralegal in the Wachovia (now Wells Fargo) corporate legal department, who states that, after conducting a search of Wachovia's systems, she was not able to locate any account opened in the name of Gregory Raifman or Susan Raifman.  Dkt. 5, Minakais Decl. ¶ 3.

---

[2] In their Statement of Claim, Defendants explain that they previously obtained a FINRA arbitral award against PCG and Ramos with respect to the loan transactions at issue.  Id. at 13.

1    Turning back to the loan transaction, on August 8, 2003, Mr. Raifman signed a

2    Wachovia "Joint Owner/Associated Person Information" form, providing various items of

3    personal information.  Raifman Decl. Ex. 2.  In the section entitled "Relationship to Primary

4    Account Owner," Mr. Raifman wrote "TTEE."  Id.  On August 29, 2003, Mrs. Raifman also

5    signed a Wachovia "Joint Owner Associated Person Information" form, setting forth her

6    personal information.  Id. Ex. 3.  Mrs. Raifman wrote "Wife" in the section entitled

7    "Relationship to Primary Account Owner."  Id.  In his Supplemental Declaration, Gordon

8    explains that the "Joint Ownership/Associated Person Information" is a form:

9
10       that was required by Wachovia whenever a non-natural entity, such as a trust,
     sought to open an account among other things.  The form is used to notify
     Wachovia as to those individuals who can act on behalf of the non-natural
11   account holder.  In the case of Exhibits 2 and 3 [of the Raifman Decl.], the Trust
     (as account holder) informed Wachovia that Gregory Raifman and Susan
12   Raifman, as trustees, were empowered to act on its behalf vis-à-vis the account
     at Wachovia.
13

14   Dkt. 20, Supp. Gordon Decl. ¶ 3.

15       Subsequently, Gordon set up a Wachovia account for the Raifmans.  Wood Decl., Ex. A

16   at 13.  At Gordon's direction, the Raifmans executed an Authorization to Transfer Securities or

17   Money to transfer their ValueClick shares into Derivium affiliate Witco Services Ltd.'s

18   ("Witco") account, established by Wachovia.  Id.  That document did not authorize Wachovia

19   to sell the Raifmans' securities.  Id.  Nevertheless, without informing the Raifmans, Wachovia

20   sold the Raifmans' 320,000 shares of ValueClick stock collateral immediately upon receipt into

21   Witco's account for a total of $2,914,683.  Id.  Derivium and Wachovia transferred 90% of the

22   sale proceeds, or $2,623,215, to the Raifmans to fund the loan, and then "pocketed" the

23   remaining 10%, or $291,648.  Id.  The Raifmans believed that their stock would be held upon

24   transfer into Witco's Wachovia account, and did not know it had been sold until 2007.  Id. at

25   13-14.

26

27

28

1

2
> ### 2.      The Second Loan Transaction Between Helicon and Derivium's Affiliate Optech Ltd.

3       In July 2004, Helicon entered into a second "90% Stock Loan" agreement with

4 Derivium's affiliate, Optech Ltd. ("Optech").  <u>Id</u>. at 14.  Helicon is a company wholly-owned

5 by the Raifmans.  Compl. ¶ 8.  Helicon has since assigned all rights and claims arising out of

6 Helicon's investments to "Gregory and Susan Raifman, as Trustees of the Raifman Family

7 Trust."  Raifman Decl., Ex. 4 at 1.  Helicon deposited 300,000 shares of Value Click into

8 Optech's Wachovia account.  Wood Decl., Ex. A at 14.  Again, Wachovia immediately sold the

9 shares upon receipt into the Optech account.  <u>Id</u>.  Derivium and Wachovia then transferred 86%

10 of the sale proceeds, or $2,810,475 to the Raifmans to fund the loan, and "pocketed" the

11 remaining 14%, or $457,519.  <u>Id</u>.  The Raifmans did not discover the sale of the shares until

12 March 2007.  <u>Id</u>.

13       According to the Gordon Declaration, Helicon never opened an account with him at

14 Wachovia.  Gordon Decl. ¶ 4.  Moreover, Ms. Minakais states that she was not able to locate

15 any Wachovia account opened in the name of Helicon.  Minakais Decl. ¶ 3.

16
> ### 3.      The Third Loan Transaction Between Gekko and Optech

17       In November 2004, Gekko entered into a third "90% Stock Loan" agreement with

18 Optech.  Wood Decl., Ex. A at 14.  Gekko is a limited liability company with the Raifmans as

19 the only members.  Raifman Decl., ¶ 9.  Gekko deposited 200,000 shares of Value Click into

20 Optech's Wachovia account.  Wood Decl., Ex. A at 14.  Once more, Wachovia immediately

21 sold the shares upon receipt into the Optech account.  <u>Id</u>.  Derivium and Wachovia then

22 transferred 90% of the sale proceeds, or $2,160,266 to the Raifmans to fund the loan, and

23 "pocketed" the remaining 10%, or $240,029.  <u>Id</u>. at 14-15.  Again, the Raifmans did not

24 discover the sale of the shares until March 2007.  <u>Id</u>. at 15.

25       Gordon indicates that Gekko never opened an account with him at Wachovia.  Gordon

26 Decl. ¶ 4.  Also, Ms. Minakais states that she was not able to locate any Wachovia account

27 opened in the name of Gekko.  Minakais Decl. ¶ 3.

28

**B.     PROCEDURAL HISTORY**

On October 8, 2010, Plaintiffs filed a diversity jurisdiction complaint for declaratory and injunctive relief.  Plaintiffs seek to enjoin Mr. and Mrs. Raifman, in their <u>individual</u> capacities, and Gekko and Helicon (collectively, "Defendants") from proceeding with their claims in the FINRA arbitration and to stay the arbitration proceedings with respect to those claims.  Plaintiffs contend that there is no agreement to arbitrate between either Plaintiff and any of the Defendants, and no Defendant is, or ever has been, a "customer" of Plaintiffs, such that Plaintiffs would be required to arbitrate Defendants' claims under the applicable FINRA rules.  Compl. ¶ 2.

Notably, while the Raifman Trust is also a claimant in the FINRA arbitration, Plaintiffs have not named the Raifman Trust as a defendant here "because the Statement of Claim alleges that the Trust actually opened an account with Wachovia."  <u>Id</u>. ¶ 20 n. 2.  Therefore, Plaintiffs only challenge arbitration of the claims related to the <u>second and third</u> loan transactions, described above.  <u>Id</u>.

Also on October 8, 2010, Plaintiffs filed the instant Ex Parte Motion for Temporary Restraining Order and Order to Set Show Cause Hearing for Preliminary Injunction.  Dkt. 3. By that motion, Plaintiffs seek: (1) an order temporarily restraining and enjoining Defendants from proceeding with their claims in the FINRA arbitration; (2) an order temporarily staying the proceedings in the FINRA arbitration; and (3) an order to show cause as to why Defendants should not be preliminary restrained and enjoined, pending trial of this action, from proceeding with the FINRA arbitration, and why proceedings in the FINRA arbitration should not be stayed.

After Plaintiffs filed their motion, the parties submitted a stipulation indicating that Plaintiffs shall have until October 22, 2010 to file an answer in the FINRA arbitration, in order to allow Defendants an opportunity to respond to Plaintiffs' motion.  This matter has now been fully briefed.

## II.   **LEGAL STANDARD**

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., --- U.S. ---, ---, 129 S.Ct. 365, 376 (2008).[3]  A party seeking injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly, 572 F.3d 644, 651 (9th Cir. 2009) (quoting Winter, 129 S.Ct. at 374).  The issuance of an injunction is committed to the discretion of the district court.  Id.

Plaintiffs erroneously rely on the Ninth Circuit's pre-Winter alternative "sliding-scale" test under which an injunction may be granted where the plaintiff "demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor."  Save Our Sonoran, Inc., v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005).  In light of Winter, the Ninth Circuit has abandoned that test.  See National Meat Ass'n v. Brown, 599 F.3d 1093, 1097 n.3 (9th Cir. 2010); Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009).

Arbitrability is "[the] question [of] whether the parties have submitted a particular dispute to arbitration."  Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002).  "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."  AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 649 (1986).  In this case, Defendants have not argued against this Court deciding arbitrability.

## III.   **ANALYSIS**

FINRA arbitrations are governed by the National Association of Securities Dealers ("NASD") Code of Arbitration Procedure.  Rule 12200 of the Code states:

---

[3] The standard for relief applicable to a temporary restraining order is the same as for a preliminary injunction.  See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

Parties must arbitrate a dispute under the Code if:

• Arbitration under the Code is either:

       (1) Required by a written agreement; or

       (2) Requested by the customer.

• The dispute is between a customer and a member or associated person of a member; and

• The dispute arises in connection with the business activities of the member or the associated person, except the insurance business activities of a member that is also an insurance company.

NASD Code Arb. Proc. 12200. Therefore, under the Code, <u>customers</u> can compel registered members of FINRA to arbitrate certain disputes even when no written arbitration agreement exists. <u>See</u> NASD Code Arb. Proc. 12200; <u>see also</u> <u>Goldman Sachs & Co. v. Becker</u>, No. 07-1599, 2007 WL 1982790 at *5 (N.D. Cal. 2007).

Here, Plaintiffs do not dispute that they are members subject to the NASD Code, or that this dispute arises in connection with Plaintiffs' business activities as members. Additionally, Defendants do not assert that they entered into a written arbitration agreement with Plaintiffs. Therefore, the only disputed issue is whether Defendants are "customers" of Plaintiffs who have a right to demand arbitration under the NASD Code.

The NASD Code does not define the term "customer," although the Code does provide that the term "customer shall not include a broker or dealer." NASD Code Arb. Proc. 12100(i); <u>accord</u> <u>Herbert J. Sims & Co., Inc. v. Roven</u>, 548 F. Supp. 2d 759, 763 (N.D. Cal. 2008). Nor has the Ninth Circuit further defined this term. There are, however, decisions authored by judges of this court and several out-of-circuit cases that inform the analysis as to whether Defendants are customers of Plaintiffs, and therefore, entitled to arbitrate their claims. In this analysis, the courts are guided by the notion that the term "customer" should not be too narrowly construed, nor should the definition upset the reasonable expectations of FINRA members. <u>See</u> <u>Oppenheimer v. Neidhardt</u>, 56 F.3d 352, 357 (2d Cir. 1995); <u>Wheat, First Sec., Inc. v. Green</u>, 993 F.2d 814, 820 (11th Cir. 1993).

In Goldman Sachs & Co. v. Becker, the court noted that some courts have held that a direct customer relationship between the member firm and the purported customer is not necessary, so long as there is "some nexus between the investor and the member or associated person."  Goldman Sachs, 2007 WL 1982790, at *6 (N.D. Cal. 2007) (Alsup, J.) (quoting Malak v. Bear Stearns & Co., Inc., 2004 WL 213014, at *4 (S.D.N.Y. 2004)).[4]  Other courts, the Goldman Sachs court explained, "have interpreted 'customer' to require the purchase of securities from that NASD member, or to require at least some informal business relationship between the parties."  Id. (citing Fleet Boston Robertson Stephens v. Innovex, Inc. 264 F.3d 770 (5th Cir. 1993); BMA Financial Servs. Inc. v. Buin, 164 F. Supp. 2d 813, 819 (W.D. La. 2001)).  The court found that the alleged customer relationship in Goldman Sachs was too tenuous because the relationship was based on (a) either the member firm's underwriting of another firm's initial public offering or (b) the member firm's alleged ownership of the purported customers' mortgage.  Id.  The court instead found that the investors' customer relationship, if any, was with the firm that it purchased investment products from or the mortgage servicer itself, but not the member firm that was only tangentially related to these transactions.  Id.

Also instructive is Herbert J. Sims & Co., Inc. v. Roven, 548 F.Supp.2d 759 (N.D. Cal. 2008) (Jenkins, J.).  There, plaintiff, a member of FINRA, was an investment banking and brokerage firm whose business activities included underwriting and selling new bond offerings.  Id. 761.  Defendants were an investment advisor, Darden, and his clients, who held accounts with a third party discount brokerage, Seibert.  Id.  Darden had communicated over the years with Drayer, a broker working for plaintiff.  Darden's clients participated in approximately forty of plaintiff's bond offerings over the years.  Id.  Siebert did not maintain an inventory of plaintiff's bonds and it had to fill orders for these bonds directly from plaintiff.  Plaintiff sought to enjoin defendants from pursing a FINRA arbitration relating to defendants' claim that one of plaintiff's bond offerings, in which Darden's clients had invested with his assistance, was an

---

[4] An "associated person" under the NASD rules has been described as including "a natural person associated with an investment bank who was authorized to sell securities on its behalf …."  Id. (citing John Hancock Life Ins. v. Wilson, 254 F.3d 48, 59 (2d Cir. 2001)).

1  unsuitable investment.  Plaintiff argued that defendants were not its "customers."  The court

2  granted injunctive relief, rejecting defendants' argument that "an investment made through a

3  brokerage firm, on advice from an agent at a separate firm, creates a customer relationship

4  between the investor and the latter firm …"  <u>Id</u>. at 766.   The court ruled "[i]nstead, the case

5  law supports the conclusion that the reasonable expectations of the parties in this case are that

6  the Investors were customers of Seibert, not Plaintiff."  <u>Id</u>.

7          In <u>Brookstreet Securities Corp. v. Bristol Air, Inc</u>., the district court confirmed that

8  narrow definitions of the term "customer" have been rejected, but that the term must not be

9  defined so broadly as to upset the reasonable expectations of FINRA members.  No. C 02-

10  0863, Slip Op. at 11 (N.D. Cal. filed August 5, 2002) (Illston, J.)  The court explained that a

11  customer relationship was typically created between a member firm and a third party when "the

12  individual who solicited the investments or provided investment advice to the purported

13  'customers' was a representative or employee of the broker."  <u>Id</u>.  In the cases reviewed by the

14  court, the solicitor was a representative or employee of the broker with whom the investor

15  made an investment.  <u>Id</u>. at 11-12.  The court found that a customer relationship was not

16  established when the investors interacted only with their investment advisor, who maintained

17  an account with the member firm Brookstreet, but was not an employee, agent or registered

18  representative of Brookstreet.  <u>Id</u>. at 12.  In <u>Brookstreet</u>, the court determined that while the

19  investment advisor himself was a customer of the member Brookstreet, the investors were not.

20  <u>Id</u>.

21          Certain out-of-circuit cases similarly set out the parameters of who is, and is not, a

22  "customer."  If an investor invests directly with a member firm, then the investor is likely a

23  customer of that firm.  <u>See</u> <u>Oppenheimer,</u> 56 F.3d at 357.  Moreover, if an "associated person"

24  of the member firm solicits an investor to invest funds with the member, then the investor is

25  also a customer of that firm.  <u>See id</u>.; <u>John Hancock Life Ins</u>., 254 F.3d at 59 (holding that a

26  customer relationship with an associated person is sufficient to establish a customer

27  relationship with the member firm itself).  When, however, the relationship between the parties

28  is more tenuous, courts should determine if there is "some brokerage or investment relationship

between the parties." See Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770, 772 (8th Cir. 2001). In Fleet, the Eighth Circuit held "[w]e agree with the district court that 'customer' does not include an entity such as AdFlex, which only received financial advice, without receiving investment or brokerage related services, from an NASD member." Id. at 773.

Applying those principles here, the next question is whether Plaintiffs have made a showing of likelihood of success of the merits regarding their assertion that Defendants are not Plaintiffs' "customers" with respect to the Helicon (second) and Gekko (third) loan transactions.

**A.     LIKELIHOOD OF SUCCESS ON THE MERITS**

As indicated above, Helicon and Gekko never opened an account with Wachovia. Defendants do not dispute those facts. Rather, Defendants argue that the Raifmans, as individuals, were customers of Wachovia "because they signed a Wachovia Account Application and a Joint Owner Information with Wachovia." Defs.'s Opp. at 10. It follows, according to Defendants, that they can compel arbitration of issues related to the second and third loan transactions (a) as individuals, and (b) in their capacities as sole members of Gekko and assignees in interest and beneficial owners of Helicon.

However, the submitted evidence shows that the only party that opened an account with Wachovia was the Raifman Trust, not the Raifmans individually. There are no allegations that Wachovia or Gordon was a party to Helicon's or Gekko's loan agreements with the Derivium affiliates. The Raifmans concede that it was their own financial advisor, PCG, that gave them advice with respect to their stock loan transactions, not Plaintiffs. The only connection Helicon and Gekko had with Plaintiffs is that Helicon and Gekko transferred securities directly to the Wachovia accounts of the Derivium affiliates.

Given those facts, the analysis in Brookstreet, described above, is instructive. There, the court found that investors were not "customers" of Brookstreet because the only relationship between the investors and Brookstreet was that the inventors placed their funds into their financial advisor's account at Brookstreet. There were no other interactions between

1    Brookstreet and the investors.  The advisor was Brookstreet's customer, while the investors

2    were not.  The Brookstreet court rejected the notion, also advanced by the instant Defendants,

3    that a "person who is merely doing business with an account holder of a member firm becomes

4    a 'customer' of the firm itself."  Brookstreet at 12.

5         Put simply, the Raifmans' (as individuals), and Helicon's and Gekko's relationships

6    with Plaintiffs are too tenuous for Plaintiffs to reasonable expect that they would be subject to

7    FINRA arbitration with respect to the second and third loan transactions.  Of note, Defendants

8    have failed to offer any decisional authority in support of their argument that they are

9    "customers" of Plaintiffs, nor have they attempted to distinguish the cases cited by Plaintiffs,

10   including Brookstreet.

11        As an alternative matter, Defendants argue that the Raifmans are third-party

12   beneficiaries of the transactions entered into by the Raifman Trust, Helicon, and Gekko, which

13   Defendants assert provides them with the right to arbitration.   However, the third-party

14   beneficiary doctrine does not support Defendants assertion, as the case law submitted by

15   Defendants makes clear that they have to be intended beneficiaries of an agreement to arbitrate.

16   Comer v. Micor, Inc., 436 F.3d 1098, 1102 (9th Cir. 2006); Fisser v. International Bank, 282

17   F.2d 231, 233 n.6 (2d Cir. 1960). Here, Defendants have not shown that any of them is an

18   intended beneficiary of the account agreement between the Raifman Trust and Wachovia.

19   Moreover, Defendants' purported reliance on an assignment of certain claims given by Helicon

20   to the Raifman Trust is equally misguided.  As indicated above, Helicon (and Gekko) have no

21   right to arbitrate because they are not "customers" of Plaintiffs.  Thus, Helicon cannot assign a

22   right to the Raifman Trust it did not have.

23        In sum, Plaintiffs are likely to succeed in showing that the relationships between

24   Defendants and Plaintiffs are too tenuous to establish any customer relationships and to compel

25   FINRA arbitration.

26        **B.    IRREPARABLE HARM**

27        Plaintiffs also assert that they will suffer irreparable harm if the arbitration is not stayed

28   because they have no adequate remedy at law to recover the monetary and resources they

- 12 -

1   would expend in defense of the arbitration.  See e.g., Maryland Cas. Co. v. Realty Advisory

2   Bd. on Labor Rels., 107 F.3d 979, 984-85 (2d Cir. 1997) ("Although an injury that is

3   adequately compensated by a monetary award is not considered 'irreparable,' …here the time

4   and resources [plaintiff] would expend in arbitration is not compensable by any monetary

5   award of attorneys' fees or damages pursuant to the provisions of the Agreement or the

6   Arbitration Act."); see also Brookstreet at 12 (finding that a party will suffer irreparable harm

7   if arbitration is not stayed); Goldman Sachs, 2007 WL 1982790, at *7 (same).  Defendants do

8   not argue otherwise.  Thus, Plaintiffs have shown that it is possible that they will suffer

9   irreparable harm.

10          **C.      BALANCE OF THE EQUITIES**

11          Plaintiffs argue that, whereas they are likely to suffer irreparable harm in the absence of

12   a temporary restraining order, Defendants are not likely to suffer any harm if the Court enjoins

13   the arbitration proceedings because Defendants can bring their claims in a court of competent

14   jurisdiction.  Defendants offer no argument to the contrary.  Therefore, this factor weighs in

15   favor of granting Plaintiffs' motion.

16          **D.      PUBLIC INTEREST**

17          Plaintiffs have failed to address the public interest factor of the Winter test because they

18   have applied the wrong legal standard.  Likewise, Defendants have not offered any argument

19   on this issue.  Nevertheless, it is touched on briefly here.

20          Federal policy favors arbitration.  Volt Sciences, Inc. v. Bd. of Trustees of Leland

21   Stanford Junior Univ., 489 U.S. 468, 475 (1989).  However, "[o]ne of the threads running

22   through federal arbitration jurisprudence is the notion that arbitration is a matter of contract and

23   a party cannot be required to submit to arbitration any dispute which he has not agreed so to

24   submit."  AT & T Techs., 475 U.S. at 648 (internal quotations omitted).  As explained above,

25   Defendants are not "customers" of Plaintiffs, and, therefore, Plaintiffs did not agree to submit

26   to arbitration of Defendants' claims.  As such, this factor also weighs in favor of granting

27   Plaintiffs' motion.

28

IV.   **CONCLUSION**

For the foregoing reasons,

IT IS HEREBY ORDERED THAT:

1.     Plaintiffs' Ex Parte Motion for Temporary Restraining Order and Order to Set Show Cause Hearing for a Preliminary Injunction is GRANTED.  Defendants Gregory Raifman, in his individual capacity, Susan Raifman, in her individual capacity, Gekko Holdings, LLC and Helicon Investments, LTD ("Defendants") are temporarily restrained and enjoined from proceeding with their respective claims against Plaintiffs in the FINRA arbitration, and all proceedings in the FINRA arbitration with respect to only those claims are temporarily stayed.

2.     Within three (3) court days of the entry of this Order, Plaintiffs shall post a bond in the amount of $10,000 as a condition of this Order.[5]

3.     Defendants shall appear in Department 1 of this Court, Judge Saundra Brown Armstrong presiding, on November 2, 2010, at 1:00 p.m. to show cause why the temporary restraining order issued this date should not continue in full force as a preliminary injunction pending trial on the merits.  Defendants shall file an opposition to Plaintiffs' motion for preliminary injunction by no later than October 26, 2010.  Any reply shall be filed no later than October 28, 2010.

4.     This Order terminates Docket 3.

IT IS SO ORDERED.

Dated: October 20, 2010.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE
(GENERAL DUTY JUDGE)

---

[5] The Court notes that neither party has addressed the amount of bond, if any, that Plaintiffs should be required to post in this case.