UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| WACHOVIA SECURITIES, LLC, n/k/a WELLS FARGO ADVISORS, LLC, and GEORGE GORDON, III,<br><br>Plaintiffs,<br><br>vs.<br><br>GREGORY RAIFMAN, in his individual capacity, SUSAN RAIFMAN, in her individual capacity, GEKKO HOLDINGS, LLC, and HELICON INVESTMENTS, LTD.,<br><br>Defendants. | Case No: C 10-04573 SBA<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Dkt. 3 |

On October 8, 2010, Plaintiffs filed a diversity jurisdiction complaint for declaratory and injunctive relief. Plaintiffs seek to enjoin Defendants from proceeding with their claims against Plaintiffs in a Financial Industry Regulatory Authority ("FINRA") arbitration and to stay the arbitration proceedings. Along with their Complaint, Plaintiffs filed an Ex Parte Motion for Temporary Restraining Order and Order to Set Show Cause Hearing for a Preliminary Injunction ("TRO Motion").

On October 20, 2010, the Court granted Plaintiffs' TRO Motion, temporarily enjoining Defendants from proceeding with the FINRA arbitration. Dkt. 24. The Court granted the motion, in part, because Plaintiffs had shown that they are likely to succeed on their claim that Defendants are not "customers" of Plaintiffs, such that Defendants can compel arbitration. Now, the parties are before the Court on Plaintiffs' Motion for Preliminary Injunction. Dkt. 3. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS the motion for the reasons set forth below. The Court, in

its discretion, finds this matter suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b).

I. **BACKGROUND**

   A. **FACTUAL BACKGROUND**

On July 19, 2010, Defendants Gregory Raifman and Susan Raifman filed a Statement of Claim with FINRA, to commence arbitration against the instant Plaintiffs - Wachovia Securities Financial Network, LLC ("Wachovia") and George Gordon, III ("Gordon"), a Wachovia financial advisor (collectively, "Plaintiffs").  Compl. ¶ 1.  In their Statement of Claim, the Raifmans assert the following claims against Plaintiffs: (1) fraud, concealment, and conspiracy to commit fraud; (2) breach of fiduciary duty; (3) breach of contract; (4) aiding and abetting fraud and breach of fiduciary duty; (5) violation of the California Securities Act; (6) violation of NASD and NYSE rules; and (7) conversion.  Id. ¶ 13; see also Dkt. 4, Wood Decl., Ex. A at 20-26.  Defendants seek, among other things, $2,128,035 in compensatory damages and $10,235,600 in consequential damages.  Wood Decl., Ex. A at 27.

The Raifmans bring their FINRA action individually and as trustees of the Raifman Family Revocable Invervivos Trust (the "Raifman Trust"), as sole members of Gekko Holdings, Ltd. ("Gekko"), and as assignees in interest and beneficial owners of Helicon Investments, Ltd. ("Helicon").  Id. at  2.  As explained more fully below, the Statement of Claim alleges that each of these three entities had entered into separate "90% Stock Loan" transactions with third-party Derivium Capital, LLC ("Derivium") or its related entities.

   1. **The First Loan Transaction Between the Raifman Trust and Derivium**

According to Defendants' FINRA Statement of Claim, Derivium marketed a "90% Stock Loan" to prospective borrowers, including the Raifmans.  Id. at 6.  Derivium solicited the Raifmans to pledge publicly-traded stock (specifically, shares in "ValueClick") to Derivium as collateral for loans in the amount of 90% of the collateral's market value.  Id.  The 90% Stock Loan was marketed as a way for owners of securities to borrow up to 90% of the value of their stock without selling the stock.  Id. at 2.  A major feature in the marketing material for the 90%

- 2 -

Stock Loan was that the transaction was a loan, not a sale, so even though the Raifmans would receive 90% of the value of their securities in cash as a loan, the loan would not trigger capital gains tax recognition, and the Raifmans could defer paying capital gains tax for the three-year loan term.  Id.  Derivium represented to the Raifmans that it would employ a proprietary hedging strategy that would preserve the value of the collateral.  Id. at 6.  At the end of the loan term, the Raifmans could pay the loan balance and retrieve their collateral, surrender their collateral in satisfaction of the loan, or renew their loan.  Id.

In August 2003, based upon these representations, and upon the advice of the Raifmans' own financial advisors, Private Consulting Group, Inc. ("PCG") and Joe Ramos, PCG's Managing Director, the Raifmans entered into a loan agreement, as trustees of the Raifman Trust, with Derivium.[1]  Id. at 12.  Derivium and PCG instructed the Raifmans to open an account at Wachovia in the name of the Raifman Trust.  Id.  Wachovia selected Gordon as the financial advisor to the Raifmans' account.  Id. at 13.

When the Raifmans opened the Wachovia account, they completed an Account Application, listing under the section "Account Registration" the "Raifman Family Rev Inter Trust DTD 07/02/2003 Gregory R. Raifman & Susan Raifman TTEES."  Dkt. 15, Raifman Decl., Ex. 1 at 1.  The application also states that the account is a "Non-Personal Account Types – Trust," and the Raifmans indicate in their respective signatory lines that they are each signing under the title "TTEE."  Id. at 3.  Moreover, under the section "Primary Account Owner Information," the application lists only the "Raifman Fam Rev Inter Trust."  Id.

In his declaration, Mr. Raifman represents that the Account Application "registered the Raifman Family Rev. Inter. Trust, Gregory Raifman, and Susan Raifman as trustee and Gregory R. Raifman as the Account holders."  Id. ¶ 2 (emphasis added).  However, according to the Gordon Declaration, "the Raifmans, in their individual capacities, never opened an account with me at Wachovia …."  Dkt. 6, Gordon Decl. ¶ 4 (emphasis added).  Moreover, Plaintiffs have submitted a declaration from Christina Minakais, senior paralegal in the

---

[1] In their Statement of Claim, Defendants explain that they previously obtained a FINRA arbitral award against PCG and Ramos with respect to the loan transactions at issue.  Id. at 13.

Wachovia (now Wells Fargo) corporate legal department, who states that, after conducting a search of Wachovia's systems, she was not able to locate any account opened in the name of Gregory Raifman or Susan Raifman.  Dkt. 5, Minakais Decl. ¶ 3.

Turning back to the loan transaction, on August 8, 2003, Mr. Raifman signed a Wachovia "Joint Owner/Associated Person Information" form, providing various items of personal information.  Raifman Decl. Ex. 2.  In the section entitled "Relationship to Primary Account Owner," Mr. Raifman wrote "TTEE."  Id.  On August 29, 2003, Mrs. Raifman also signed a Wachovia "Joint Owner Associated Person Information" form, setting forth her personal information.  Id. Ex. 3.  Mrs. Raifman wrote "Wife" in the section entitled "Relationship to Primary Account Owner."  Id.  In his Supplemental Declaration, Gordon explains that the "Joint Ownership/Associated Person Information" is a form:

> that was required by Wachovia whenever a non-natural entity, such as a trust, sought to open an account among other things.  The form is used to notify Wachovia as to those individuals who can act on behalf of the non-natural account holder.  In the case of Exhibits 2 and 3 [of the Raifman Decl.], the Trust (as account holder) informed Wachovia that Gregory Raifman and Susan Raifman, as trustees, were empowered to act on its behalf vis-à-vis the account at Wachovia.

Dkt. 20, Supp. Gordon Decl. ¶ 3.

Subsequently, Gordon set up a Wachovia account for the Raifman Trust.  Wood Decl., Ex. A at 13.  At Gordon's direction, the Raifmans executed an Authorization to Transfer Securities or Money to transfer their ValueClick shares into Derivium affiliate Witco Services Ltd.'s ("Witco") account, established by Wachovia.  Id.  That document did not authorize Wachovia to sell the Raifmans' securities.  Id.  Nevertheless, without informing the Raifmans, Wachovia sold the Raifmans' 320,000 shares of ValueClick stock collateral immediately upon receipt into Witco's account for a total of $2,914,683.  Id.  The buyer is not identified in the Statement of Claim.  Derivium and Wachovia transferred 90% of the sale proceeds to the Raifmans to fund the loan, and then "pocketed" the remaining 10%.  Id.  The Raifmans believed that their stock would be held upon transfer into Witco's Wachovia account, and did not know it had been sold until 2007.  Id. at 13-14.

### 2. The Second Loan Transaction Between Helicon and Derivium's Affiliate Optech Ltd.

In July 2004, Helicon entered into a second "90% Stock Loan" agreement with Derivium's affiliate, Optech Ltd. ("Optech"). Id. at 14. Helicon is a company wholly-owned by the Raifmans. Compl. ¶ 8. Helicon has since assigned all rights and claims arising out of Helicon's investments to "Gregory and Susan Raifman, as Trustees of the Raifman Family Trust." Raifman Decl., Ex. 4 at 1. Helicon deposited 300,000 shares of Value Click into Optech's Wachovia account. Wood Decl., Ex. A at 14. Again, Wachovia immediately sold the shares upon receipt into the Optech account. Id. Derivium and Wachovia then transferred 86% of the sale proceeds to the Raifmans to fund the loan, and "pocketed" the remaining 14%. Id. The Raifmans did not discover the sale of the shares until March 2007. Id.

According to the Gordon Declaration, Helicon never opened an account with him at Wachovia. Gordon Decl. ¶ 4. Moreover, Ms. Minakais states that she was not able to locate any Wachovia account opened in the name of Helicon. Minakais Decl. ¶ 3.

### 3. The Third Loan Transaction Between Gekko and Optech

In November 2004, Gekko entered into a third "90% Stock Loan" agreement with Optech. Wood Decl., Ex. A at 14. Gekko is a limited liability company with the Raifmans as the only members. Raifman Decl., ¶ 9. Gekko deposited 200,000 shares of Value Click into Optech's Wachovia account. Wood Decl., Ex. A at 14. Once more, Wachovia immediately sold the shares upon receipt into the Optech account. Id. Derivium and Wachovia then transferred 90% of the sale proceeds to the Raifmans to fund the loan, and "pocketed" the remaining 10% Id. at 14-15. Again, the Raifmans did not discover the sale of the shares until March 2007. Id. at 15.

Gordon indicates that Gekko never opened an account with him at Wachovia. Gordon Decl. ¶ 4. Also, Ms. Minakais states that she was not able to locate any Wachovia account opened in the name of Gekko. Minakais Decl. ¶ 3.

### B. PROCEDURAL HISTORY

On October 8, 2010, Plaintiffs filed a diversity jurisdiction complaint for declaratory and injunctive relief. Plaintiffs seek to enjoin Mr. and Mrs. Raifman, in their <u>individual</u> capacities, and Gekko and Helicon (collectively, "Defendants") from proceeding with their claims in the FINRA arbitration and to stay the arbitration proceedings with respect to those claims. Plaintiffs contend that there is no agreement to arbitrate between either Plaintiff and any of the Defendants, and no Defendant is, or ever has been, a "customer" of Plaintiffs, such that Plaintiffs would be required to arbitrate Defendants' claims under the applicable FINRA rules. Compl. ¶ 2.

Notably, while the Raifman Trust is also a claimant in the FINRA arbitration, Plaintiffs have not named the Raifman Trust as a defendant here "because the Statement of Claim alleges that the Trust actually opened an account with Wachovia." <u>Id</u>. ¶ 20 n. 2. Therefore, Plaintiffs only challenge arbitration of the claims related to the <u>second and third</u> loan transactions, described above. <u>Id</u>.

Also on October 8, 2010, Plaintiffs filed their TRO Motion. Dkt. 3. By that motion, Plaintiffs sought: (1) an order temporarily restraining and enjoining Defendants from proceeding with their claims in the FINRA arbitration; (2) an order temporarily staying the proceedings in the FINRA arbitration; and (3) an order to show cause as to why Defendants should not be preliminary restrained and enjoined, pending trial of this action, from proceeding with the FINRA arbitration, and why proceedings in the FINRA arbitration should not be stayed. After Plaintiffs filed their TRO Motion, the parties stipulated to extend the deadline for Plaintiffs to file an answer in the FINRA arbitration, in order to allow Defendants an opportunity to respond to Plaintiffs' TRO Motion.

After full briefing on Plaintiffs' TRO Motion, the Court granted that motion, temporarily enjoining Defendants from proceeding with their claims against Plaintiffs in the FINRA arbitration. Dkt. 24. The Court also set a briefing schedule on Plaintiffs' motion for preliminary injunction. This matter has now been fully briefed and is ripe for adjudication.

## II. LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., --- U.S. ---, ---, 129 S.Ct. 365, 376 (2008). A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly, 572 F.3d 644, 651 (9th Cir. 2009) (quoting Winter, 129 S.Ct. at 374). The issuance of a preliminary injunction is committed to the discretion of the district court. Id.

All parties erroneously rely on the Ninth Circuit's pre-Winter alternative "sliding-scale" test under which a preliminary injunction may be granted where the plaintiff "demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." Save Our Sonoran, Inc., v. Flowers, 408 F.3d 1113, 1120 (9th Cir. 2005). In light of Winter, the Ninth Circuit has abandoned that test. See National Meat Ass'n v. Brown, 599 F.3d 1093, 1097 n.3 (9th Cir. 2010); Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009).

Arbitrability is "[the] question [of] whether the parties have submitted a particular dispute to arbitration." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 649 (1986). In this case, Defendants have not argued against this Court deciding arbitrability.

## III. ANALYSIS

FINRA arbitrations are governed by the National Association of Securities Dealers ("NASD") Code of Arbitration Procedure. Rule 12200 of the Code states:

>Parties must arbitrate a dispute under the Code if:
>
>• Arbitration under the Code is either:
>
>>(1) Required by a written agreement; or
>>
>>(2) Requested by the customer.
>
>• The dispute is between a customer and a member or associated person of a member; and
>
>• The dispute arises in connection with the business activities of the member or the associated person, except the insurance business activities of a member that is also an insurance company.

NASD Code Arb. Proc. 12200. Therefore, under the Code, <u>customers</u> can compel registered members of FINRA to arbitrate certain disputes even when no written arbitration agreement exists. <u>See</u> NASD Code Arb. Proc. 12200; <u>see also</u> <u>Goldman Sachs & Co. v. Becker</u>, No. 07-1599, 2007 WL 1982790 at *5 (N.D. Cal. 2007).

Here, Plaintiffs do not dispute that they are members subject to the NASD Code, or that this dispute arises in connection with Plaintiffs' business activities as members. Additionally, Defendants do not assert that they entered into a written arbitration agreement with Plaintiffs. Therefore, the only disputed issue is whether Defendants are "customers" of Plaintiffs who have a right to demand arbitration under the NASD Code.

The NASD Code does not define the term "customer," although the Code does provide that the term "customer shall not include a broker or dealer." NASD Code Arb. Proc. 12100(i); <u>accord</u> <u>Herbert J. Sims & Co., Inc. v. Roven</u>, 548 F. Supp. 2d 759, 763 (N.D. Cal. 2008). Nor has the Ninth Circuit further defined this term. There are, however, decisions authored by judges of this court and several out-of-circuit cases that inform the analysis as to whether Defendants are customers of Plaintiffs, and therefore, entitled to arbitrate their claims. In this analysis, the courts are guided by the notion that the term "customer" should not be too narrowly construed, nor should the definition upset the reasonable expectations of FINRA members. <u>See</u> <u>Oppenheimer v. Neidhardt</u>, 56 F.3d 352, 357 (2d Cir. 1995); <u>Wheat, First Sec., Inc. v. Green</u>, 993 F.2d 814, 820 (11th Cir. 1993).

In Goldman Sachs & Co. v. Becker, the court noted that some courts have held that a direct customer relationship between the member firm and the purported customer is not necessary, so long as there is "some nexus between the investor and the member or associated person." Goldman Sachs, 2007 WL 1982790, at *6 (N.D. Cal. 2007) (Alsup, J.) (quoting Malak v. Bear Stearns & Co., Inc., 2004 WL 213014, at *4 (S.D.N.Y. 2004)).[2] Other courts, the Goldman Sachs court explained, "have interpreted 'customer' to require the purchase of securities from that NASD member, or to require at least some informal business relationship between the parties." Id. (citing Fleet Boston Robertson Stephens v. Innovex, Inc. 264 F.3d 770 (5th Cir. 1993); BMA Financial Servs. Inc. v. Buin, 164 F. Supp. 2d 813, 819 (W.D. La. 2001)). The court found that the alleged customer relationship in Goldman Sachs was too tenuous because the relationship was based on (a) either the member firm's underwriting of another firm's initial public offering or (b) the member firm's alleged ownership of the purported customers' mortgage. Id. The court instead found that the investors' customer relationship, if any, was with the firm that it purchased investment products from or the mortgage servicer itself, but not the member firm that was only tangentially related to these transactions. Id.

Also instructive is Herbert J. Sims & Co., Inc. v. Roven, 548 F.Supp.2d 759 (N.D. Cal. 2008) (Jenkins, J.). There, plaintiff, a member of FINRA, was an investment banking and brokerage firm whose business activities included underwriting and selling new bond offerings. Id. 761. Defendants were an investment advisor, Darden, and his clients, who held accounts with a third party discount brokerage, Seibert. Id. Darden had communicated over the years with Drayer, a broker working for plaintiff. Darden's clients participated in approximately forty of plaintiff's bond offerings over the years. Id. Siebert did not maintain an inventory of plaintiff's bonds and it had to fill orders for these bonds directly from plaintiff. Plaintiff sought to enjoin defendants from pursing a FINRA arbitration relating to defendants' claim that one of plaintiff's bond offerings, in which Darden's clients had invested with his assistance, was an

---

[2] An "associated person" under the NASD rules has been described as including "a natural person associated with an investment bank who was authorized to sell securities on its behalf …." Id. (citing John Hancock Life Ins. v. Wilson, 254 F.3d 48, 59 (2d Cir. 2001)).

- 9 -

unsuitable investment.  Plaintiff argued that defendants were not its "customers."  The court granted injunctive relief, rejecting defendants' argument that "an investment made through a brokerage firm, on advice from an agent at a separate firm, creates a customer relationship between the investor and the latter firm …" Id. at 766.   The court ruled "[i]nstead, the case law supports the conclusion that the reasonable expectations of the parties in this case are that the Investors were customers of Seibert, not Plaintiff."  Id.

In Brookstreet Securities Corp. v. Bristol Air, Inc., the district court confirmed that narrow definitions of the term "customer" have been rejected, but that the term must not be defined so broadly as to upset the reasonable expectations of FINRA members.  No. C 02-0863, Slip Op. at 11 (N.D. Cal. filed August 5, 2002) (Illston, J.)  The court explained that a customer relationship was typically created between a member firm and a third party when "the individual who solicited the investments or provided investment advice to the purported 'customers' was a representative or employee of the broker." Id.  In the cases reviewed by the court, the solicitor was a representative or employee of the broker with whom the investor made an investment.  Id. at 11-12.  The court found that a customer relationship was not established when the investors interacted only with their investment advisor, who maintained an account with the member firm Brookstreet, but was not an employee, agent or registered representative of Brookstreet.  Id. at 12.  In Brookstreet, the court determined that while the investment advisor himself was a customer of the member Brookstreet, the investors were not.  Id.

Certain out-of-circuit cases similarly set out the parameters of who is, and is not, a "customer."  If an investor invests directly with a member firm, then the investor is likely a customer of that firm.  See Oppenheimer, 56 F.3d at 357.  Moreover, if an "associated person" of the member firm solicits an investor to invest funds with the member, then the investor is also a customer of that firm.  See id.; John Hancock Life Ins., 254 F.3d at 59 (holding that a customer relationship with an associated person is sufficient to establish a customer relationship with the member firm itself).  When, however, the relationship between the parties is more tenuous, courts should determine if there is "some brokerage or investment relationship

between the parties." See Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770, 772 (8th Cir. 2001).  In Fleet, the Eighth Circuit held "[w]e agree with the district court that 'customer' does not include an entity such as AdFlex, which only received financial advice, without receiving investment or brokerage related services, from an NASD member." Id. at 773.

Applying those principles here, the next question is whether Plaintiffs have shown a likelihood of succeeding on the merits regarding their assertion that Defendants are not Plaintiffs' "customers" with respect to the Helicon (second) and Gekko (third) loan transactions.

### A.   LIKELIHOOD OF SUCCESS ON THE MERITS

#### 1.   Defendants Are Not "Customers" of Plaintiffs

As indicated above, Helicon and Gekko never opened an account with Wachovia. Defendants do not dispute those facts.  Rather, Defendants argue that the Raifmans, as individuals, were customers of Wachovia because they signed a Wachovia Account Application and a Joint Owner Information with Wachovia.  It follows, according to Defendants, that they can compel arbitration of issues related to the second and third loan transactions (a) as individuals, and (b) in their capacities as sole members of Gekko and assignees in interest and beneficial owners of Helicon.

However, the submitted evidence shows that the only party that opened an account with Wachovia was the Raifman Trust, not the Raifmans as individuals.  There are no allegations that Wachovia or Gordon was a party to Helicon's or Gekko's loan agreements with the Optech.  The Raifmans concede in their Statement of Claim that it was their own financial advisor, PCG, that gave them advice with respect to their stock loan transactions, not Plaintiffs. The only connection Helicon and Gekko had with Plaintiffs is that Helicon and Gekko transferred securities directly to the Wachovia accounts of Optech.

Given those facts, the analysis in Brookstreet, described above, is instructive.  There, the court found that investors were not "customers" of Brookstreet because the only relationship between the investors and Brookstreet was that the inventors placed their funds

- 11 -

into their financial advisor's account at Brookstreet. There were no other interactions between Brookstreet and the investors. The advisor was Brookstreet's customer, while the investors were not. The Brookstreet court rejected the notion, also advanced by the instant Defendants, that a "person who is merely doing business with an account holder of a member firm becomes a 'customer' of the firm itself." Brookstreet at 12. Put simply, the Raifmans' (as individuals), and Helicon's and Gekko's relationships with Plaintiffs are too tenuous for Plaintiffs to reasonable expect that they would be subject to FINRA arbitration with respect to the second and third loan transactions.

As in their opposition to Plaintiffs' TRO Motion, Defendants again have not attempted to distinguish the decisional authority cited by Plaintiffs, including Brookstreet. Instead, they proffer a new argument: that Defendants are entitled to compel arbitration of their claims under agency and third-party beneficiary principles. That argument is without merit, as discussed below.

### 2. Defendants' Agency Argument

Defendants assert, without submitting any supporting evidence, that Wachovia's brokerage account agreement with Optech contains a written arbitration provision. Dkt. 31, Defs.' Opp. at 9. As indicated, Optech was the Derivium affiliate with whom Gekko and Helicon entered into loan transactions. Defendants next argue that Optech was the agent of Gekko and Helicon, by way of the loan agreements, and Gekko and Helicon can therefore enforce the written arbitration agreement with Wachovia as principals. In particular, the loan agreement between Optech and Helicon states that Optech "is hereby engaged and authorized by [Helicon] to undertake the following activities: … [p]rovide, as lender, or arrange, as agent, financing by way of a loan or loans from one or more lenders …. [and] [h]old, as agent and secured party, in accounts located with a nationally or internationally recognized financial institution, collateral …." Dkt. 30, Raifman Decl., Ex. 5 ¶ 1 (emphasis added). The loan agreement between Optech and Gekko contains similar language. Id., Ex. 6 ¶ 1.

As an initial matter, Defendants have failed to submit the brokerage account agreement between Wachovia and Optech containing the alleged arbitration provision. Nor have they

submitted any testimonial evidence regarding the terms of the account agreement.  On that basis alone, their agency argument fails.  Defendants' agency argument also fails on its merits.  Defendants do not allege that Optech <u>opened</u> its brokerage account at Wachovia on Defendants' behalf or as Defendants' agent.  Rather, pursuant to the loan agreements, Optech was required, as Defendants' agent, to simply <u>hold</u> Defendants' collateral (i.e., the ValueClick shares) in such an account.  Defendants offer no evidence that Optech entered into the Wachovia account agreement in any capacity other than on its own behalf.

The case law cited by Defendants is also unavailing.  <u>Harris v. Sup. Ct. (Mirsaidi)</u>, 188 Cal. App. 3d 475, 478-79 (1986) stands for the proposition that where a principal enters into an agreement with a third-party, and where the principal can only provide its services to the other party through its employee agents, those agents may also be required to arbitrate disputes covered by the arbitration agreement.  <u>Id.</u> at 478-79.  Here, Defendants do not claim to be agents of a principal who is party to an agreement to arbitrate.  Rather, they claim the exact opposite; namely, to be principals of an agent who entered into an arbitration agreement.  Moreover, as previously noted, here, the alleged agent (i.e., Optech) is not alleged to have entered into the agreement on behalf of the principals.

<u>Barrowclough v. Kidder, Peabody, & Co., Inc</u>., 752 F.2d 923, 938 (3rd Cir. 1985) (overruled on other grounds in <u>Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc</u>., 7 F.3d 1110, 1112 (3rd Cir. 1993)) also does not apply here.  In that case, the court's analysis was not based on any alleged agency relationship.  <u>Id</u>. at 938.  Rather, the court focused on whether an employee's contingent beneficiaries (i.e., family members) were bound by the employee's arbitration agreement with his employer to arbitrate their derivative claims against the employer.  <u>Id</u>. at 938.  In <u>Barrowclough</u>, the family members were essentially standing in the shoes of the employee with respect to their claims against the employer.  Here, Defendants' claims are not derivative of any claims that Optech may have.  Indeed, there is no allegation that Optech is pursuing claims against anyone.

Finally, Defendants' reliance on <u>American Builder's Ass'n v. Au-Yang</u>, 226 Cal. App. 3d 170, 176 (1990) is misplaced.  That case stands for the unremarkable proposition that a

1  contract made by an agent for an undisclosed principal is for most purposes deemed a contract
2  of the principal. Id. at 176. Here, as previously noted, however, the alleged agent, Optech, is
3  not alleged to have entered into the account agreement with Wachovia on behalf of Defendants,
4  its alleged principals, or other than on its own behalf.

### 3.     Defendants' Third-Party Beneficiary Argument

In their TRO papers, Defendants claimed that they were third-party beneficiaries of the Raifman Trust's account agreement with Wachovia, and therefore could enforce the arbitration provision of that agreement. In its Order granting Plaintiffs' TRO Motion, the Court rejected that argument, pointing out that, pursuant to the case law cited by Defendants, Defendants have to be intended beneficiaries of an agreement to arbitrate, not simply beneficiaries of a trust agreement. See Dkt. 24 at 12; citing Comer v. Micor, Inc., 436 F.3d 1098, 1102 (9th Cir. 2006); Fisser v. International Bank, 282 F.2d 231, 233 n.6 (2d Cir. 1960). Defendants also failed to submit as evidence the alleged arbitration provision.

Now, Defendants have abandoned their third-party beneficiary claim vis-à-vis the Raifman Trust, and instead contend they were third-party beneficiaries of the account agreement between Optech and Wachovia. While the relevant parties may have changed, the law has not. Defendants have proffered no evidence suggesting they were intended beneficiaries of an agreement to arbitrate between Optech and Wachovia.

Defendants also argue that they were third-party beneficiaries of the account agreement between Wachovia and a newly-introduced entity called the "Palladian Trust." Defendants offer a convoluted and confusing explanation regarding the relevance of the Palladian Trust to the two loan transactions at issue. As they attempt to explain, the Raifmans, as individuals, are the beneficiaries of the Palladian Trust. Raifman Decl., ¶ 2, Ex. 1. Defendants assert that the trustee of the Palladian Trust, Winward Isles Trust Company Limited, entered into a stock pledge agreement with a company called Khronos Capital Inc., which is an entity with no apparent connection to these proceedings. Id., Ex. 1. The Raifmans transferred 300,000 shares of ValueClick into the Palladian Trust account at Wachovia, and the shares were then sold without their knowledge. Id. ¶¶ 7-8. However, Defendants have entirely failed to explain how

- 14 -

this Palladian Trust transaction bears any relation to the Gekko and Helicon loan transactions at issue. Thus, Defendants' third-party beneficiary argument in this respect is wholly unpersuasive.

In sum, Plaintiffs are likely to succeed in showing that the relationships between Defendants and Plaintiffs are too tenuous to establish any customer relationships and to compel FINRA arbitration.

### B. IRREPARABLE HARM

Plaintiffs also assert that they will suffer irreparable harm if the arbitration is not stayed because they have no adequate remedy at law to recover the monetary and resources they would expend in defense of the arbitration. See e.g., Maryland Cas. Co. v. Realty Advisory Bd. on Labor Rels., 107 F.3d 979, 984-85 (2d Cir. 1997) ("Although an injury that is adequately compensated by a monetary award is not considered 'irreparable,' …here the time and resources [plaintiff] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages pursuant to the provisions of the Agreement or the Arbitration Act."); see also Brookstreet at 12 (finding that a party will suffer irreparable harm if arbitration is not stayed); Goldman Sachs, 2007 WL 1982790, at *7 (same).

In response, Defendants assert that Plaintiffs will not suffer irreparable harm because it was reasonable for them to expect that Defendants would bring FINRA arbitration claims against them. As explained above, this could not have been Plaintiffs' "reasonable expectation," as the submitted evidence shows that Defendants were not customers of Plaintiffs. In light of this factor and the relevant decisional authority, Plaintiffs have shown that it is likely that they will suffer irreparable harm if the FINRA arbitration proceeds forward.

### C. BALANCE OF THE EQUITIES

Plaintiffs argue that, whereas they are likely to suffer irreparable harm in the absence of a temporary restraining order, Defendants are not likely to suffer harm if the Court enjoins the arbitration proceedings because Defendants can bring their claims in a court of competent jurisdiction. Defendants offer no argument to the contrary. Therefore, this factor weighs in favor of granting Plaintiffs' motion.

**D.     PUBLIC INTEREST**

Plaintiffs have failed to address the public interest factor of the Winter test because they have applied the wrong legal standard.  Nevertheless, it is touched on here.

Federal policy favors arbitration.  Volt Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 475 (1989).  However, "[o]ne of the threads running through federal arbitration jurisprudence is the notion that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  AT & T Techs., 475 U.S. at 648 (internal quotations omitted).  As explained above, Defendants are not "customers" of Plaintiffs, and, therefore, Plaintiffs did not agree to submit to arbitration of Defendants' claims.  As such, this factor also weighs in favor of granting Plaintiffs' motion.

## IV.     CONCLUSION

IT IS HEREBY ORDERED THAT Plaintiffs' Motion for Preliminary Injunction (Dkt. 3) is GRANTED.  Pending further order of this Court or final adjudication on the merits, Defendants Gregory Raifman, in his individual capacity, Susan Raifman, in her individual capacity, Gekko Holdings, LLC, and Helicon Investments, LTD are enjoined from proceeding with their respective claims against Plaintiffs in the FINRA arbitration, and all proceedings in the FINRA arbitration with respect to only those claims are stayed.[3]  This Order terminates Docket 3.

IT IS SO ORDERED.

Dated: November 1, 2010

　　　　　　　　　　　　　　　　　　　　_Saundra B Armstrong_
　　　　　　　　　　　　　　　　　　　　SAUNDRA BROWN ARMSTRONG
　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[3] The parties have stipulated that no security bond should be required in this case.  Dkt. 28.